1

2 UNITED STATES DISTRICT COURT

3 EASTERN DISTRICT OF CALIFORNIA

4

5 GREGORY L. BROWN,                          Case No. 1:10 cv 00124 GSA PC

6              Plaintiff,

7 vs.                                        ORDER RE DEFENDANTS' MOTION FOR
                                            SUMMARY JUDGMENT
8 C/O LOPEZ, et al.,

9              Defendants.                   (ECF NO. 45)

10

11        Plaintiff is a state prisoner proceeding pro se and in forma pauperis in this civil rights

12 action pursuant to 42 U.S.C. § 1983.  The parties have consented to magistrate judge jurisdiction

13 pursuant to 28 U.S.C. § 636(c).[1]  Pending before the Court is Defendants' motion for summary

14 judgment.  Plaintiff has opposed the motion.[2]

15 I.    **Procedural History**

16        This action proceeds on the original complaint.  Plaintiff, currently in the custody of the

17 California Department of Corrections and Rehabilitation (CDCR) at Salinas Valley State Prison,

18 Brings this action against correctional officials employed by the California Department of

19 Corrections and Rehabilitation (CDCR) at the Substance Abuse Treatment Facility at Corcoran

20 (SATF).  In the original complaint on which this action proceeds, Plaintiff names as defendants

21 the following individuals:  Warden Ken Clark; Captain J. Reynoso; Correctional Officer (C/O)

22 C. Lantia; C/O M. Lopez.  On December 1, 2011, an order was entered, directing that this action

23

24 _____

25

26        [1] Plaintiff filed his consent to proceed before a magistrate judge on February 16, 2010 (ECF No. 8).
Defendants' consent was filed on May 18, 2012 (ECF No. 24).
27        [2] Defendants' motion for summary judgment was filed on May 17, 2013 (ECF No. 45).  On the
same date, Defendants served Plaintiff with the summary judgment notice required by Rand v. Rowland, 154 F.3d
28 952 (9th Cir. 1998), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988)(ECF No. 46.)

1

proceed on the original complaint against Defendants Lantia and Lopez for failure to protect Plaintiff, in violation of the Eighth Amendment.   Defendants Clark and Reynoso and all remaining claims were dismissed.   Defendants filed their motion for summary judgment on May 17, 2013.   Plaintiff filed his opposition on July 1, 2013.   Defendants filed a reply on August 9, 2013.

## II.   Allegations

 Plaintiff alleges that on November 18, 2008, Defendants Lantia and Lopez, stationed in the control booth in Facility C, "deliberately and maliciously" opened Plaintiff's cell door. Plaintiff alleges that "two White inmates to enter his cell and stab him eight to nine times; the assault traveled from inside the cell where one of the assailants subsequently hit him in the head with a walking cane knocking him unconscious and causing severe injuries."  (Compl. ¶12.) Plaintiff alleges that the inmates were members of a "White Supremacy Hate Group."  Plaintiff alleges that Defendants Lantia and Lopez failed to intervene to stop the assault.

## III.   Summary Judgment Standard

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> [always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denial of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible

discovery material, in support of its contention that the dispute exists.  Rule 56(e); <u>Matsushita</u>, 475 U.S. at 586 n. 11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under governing law, <u>Anderson</u>, 477 U.S. at 248; <u>Nidds v. Schindler Elevator Corp.</u>, 113 F.3d 912, 916 (9th Cir. 1996), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, <u>Matsushita</u>, 475 U.S. at 588; <u>County of Tuolumne v. Sonora Community Hosp.</u>, 263 F.3d 1148, 1154 (9th Cir. 2001).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  <u>Giles v. Gen. Motors Acceptance Corp.</u>, 494 F.3d 865, 872 (9th Cir. 2007).  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's notes on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c).  The evidence of the opposing party is to be believed, <u>Anderson</u>, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  <u>Matsushita</u>, 475 U.S. at 587 (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962)(per curiam)).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  <u>Richards v. Nielsen Freight Lines</u>, 602 F.Supp. 1224, 1244-45 (E.D. Cal. 1985)(aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is not 'genuine issue for trial.'"  <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

## IV.   **Failure to Protect**

The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates, which has been interpreted to include a duty to protect prisoners. Farmer v. Brennan, 511 U.S. 825, 832-33 (1994); Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005).  A prisoner seeking relief for an Eighth Amendment violation must show that the officials acted with deliberate indifference to the threat of serious harm or injury to an inmate. Gibson v. County of Washoe, 290 F.3d 1175, 1187 (9th Cir. 2002).  "Deliberate indifference" has both subjective and objective components.  A prison official must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and . . . must also draw the inference."  Farmer, 511 U.S. at 837.  Liability may follow only if a prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Id. at 847.

Defendants support their motion with the declarations of Defendants Lantia and Lopez, Plaintiff's deposition, relevant portions of Plaintiff's discovery responses, and relevant portions of the incident report regarding the incident at issue in this lawsuit.  Regarding the event at issue, the attack on Plaintiff on November 18, 2008, Defendant Lopez declares the following:

> On November 18, 2008, I was a control-booth officer assigned to Building 8 on Facility C at SATF.  As a control-booth operator, I was responsible for supervising inmates in Building 8, providing gun coverage, and operating the cell and sally-port doors in the building.
>
> Building 8 was a 180-design.  Meaning, the building was configured similar to a half-circle and divided into three separate living areas (Sections A to C), where the inmates were celled. Each section was separated by a concrete wall with doors at various locations leading into the adjacent section.  The control booth, which was on the second level, had a view into all three sections.  The cell doors were electronically operated from the control booth, and each section had its own control panel from where the doors were operated from the control booth, and each section had its own control panel from where the doors were operated from that specific section.
>
> In addition to a view of the housing sections, the control booth also had a view into the adjacent dining room and to the yard.  A

4

dining-control-yard officer was assigned to the control booth of a building to provide additional coverage and supervision of the inmates.  On occasion, the dining-control-yard officer assisted the control-booth-operator with the opening and closing of the cell doors during scheduled release times.

On November 18, 2008, inmate Gregory Brown (J-82241) was housed in Section C of Building 8.

For several months before November 18, 2008, Facility C was on modified program due to a riot and other incidents of violence between Black and White inmates.  The modified program suspended dayroom and recreational activities for Black and White inmates for much of this period while prison officials investigated the incidents and source of tension between the feuding groups.

Any change to the modified program was reflected in the Program Status Report (PSR).  The PSRs were issued by the Facility Captain with the Warden's approval.  PSRs were issued as needed based on changes to the modified program that prison officials were determined were necessary.

As a control-booth officer, I did not issue the PSRs, nor was I involved in preparing or issuing the PSRs.  I was also not involved in the investigation that was conducted into the incidents that resulted in the modified programs.  I did not know what, and I was not privy to, information prison officials used to determine and make modifications to the program, such as permitting certain groups to return to normal program or lifting a specific restriction.

On November 17, 2008, a PSR issued, stating that dayroom activities were "normal" for all inmates.  This meant that all inmates were to be released to the dayroom regardless of race or other classification.

To the best of my recollection, on November 18, 2008, at approximately 12:30 p.m., I was releasing inmates for interviews that were being conducted in Section B of Building 8.

On this day, Officer Lantia was the dining-control-yard officer, and was in the control booth with me.

While I was unlocking the doors in Section B, I heard the alarm sound and Lantia yell, "get down."  He was standing in front of the Section C control panel.

From my location in front of the Section B panel, I cannot see into the area where cell 124 was located in Section C, and I could not see what happened that caused Lantia to sound the alarm or give an order to get down.

I stepped in front of the C-section panel and looked down in to the dayroom area.  I saw three inmates proned out on the floor.  No

more than a matter of seconds had passed from the time I heard the alarm to the time I looked into the dayroom of Section C.

I did not delay in responding to the alarm, and by the time I was aware of what transpired, the incident was over.

At no time before this incident did Brown tell me that he had concerns for his safety or that he feared programming with White inmates. I had no knowledge that White inmates intended to attack Black inmates, such as Brown.

(Lopez Decl. ¶¶ 2-16.)   Lantia's declaration establishes the following:

As a dining-yard-control officer, I did not issue the PSRs, nor was I involved in preparing or issuing the PSRs. I was also not involved in the investigation that was conducted into the incidents that resulted in the modified programs. I did not know what, and I was not privy to, information prison officials used to determine and make modifications to the program, such as permitting certain groups to return to normal program or lifting a specific restriction.

On November 17, 2008, a PSR issued stating that dayroom activities were "normal" for all inmates. This meant that all inmates were to be released to the dayroom regardless of race or other classification.

I do not recall if dayroom activities were held on November 17, 2008.

On November 18, 2008, at approximately 12:30 p.m., I assisted Lopez with the release of inmates for dayroom. I do not recall where Lopez was standing when I started unlocking the doors in Section C.

The procedure at SATF in Building 8 was to unlock the cell doors in groups of three at the scheduled release times, such as for yard, chow, or dayroom, or upon request of an officer for an escort. The doors were controlled from the panels in the control booth.

After I unlocked the doors to cells 121 to 123, I opened the next row of three, which included Brown's cell, and moved on to the next three.

While standing at the control panel, I focused my attention on the cells I was opening when I heard a scuffle.

I drew my attention to where the scuffle was coming from and saw two inmates, who I later identified as Romero and Stark, standing outside of cell 124, striking Brown with closed fists to the head and torso.

6

I immediately activated my alarm and ordered the inmates in the dayroom to get down.

Romero and Stark did not comply with my order and continued to strike Brown, who was defending himself by covering his head and facial area with his arms.

I gave another order for the inmates to get down and took aim at them with my 40mm launcher that I carried at all times as a dining-control-yard officer.

Romero and Stark complied with my second order, and the inmates, including Brown, got down on the floor.

Responding staff entered the section and handcuffed Brown, Romero, and Stark.

The entire incident lasted a matter of seconds.

Medical staff and members of the Investigative Services Unit arrived shortly afterwards.

Medical staff attended to the inmates.  Brown appeared to have blood on his head, shoulder, and torso areas, and an emergency response vehicle transported him out of the building for further medical care.  Romero and Stark were subsequently escorted out as well.

I did not see any inmate with a cane or weapon.

When I began unlocking the cell doors for dayroom, I had no reason to suspect or believe that Brown or any inmate was going to be attacked.

At no time before this incident did Brown tell me that he had concerns for his safety or that he feared programming with White inmates.  I had no knowledge that White inmates intended to attack Black inmates, such as Brown, and I relied on the PSR dated November 17, 2008, which provided that Black and White inmates were allowed to have dayroom activities together.

I did not shoot the 40 mm launcher because the incident occurred and ended in a matter of seconds when Romero and Stark complied with my second order to get down on the floor.  Also, given the close proximity of the inmates to one another, I ran the risk of missing my intended target (Romero and Stark) and inadvertently shooting Brown had I fired the launcher.  Based on my training and experience, I did not find it necessary to fire the launcher before I gave the inmates the first order to get down because Brown was defending himself and did not appear incapacitated or overcome by Romero's and Stark's blows.  I therefore concluded that a verbal order was appropriate before

7

resorting to physical force, which can sometimes amount to deadly
force, by using the launcher.

(Lantia Decl. ¶¶ 6-25.)

Page 30 of Exhibit A to the declaration of Diana Esquivel is a copy of the Program Status

Report Part B – Plan of Operation/Staff & Inmate Notification (PSR) dated November 17, 2008.

This PSR indicates that "On Monday November 17, 2008, a meeting was convened and the

following decision was made.  Allow the White and Black inmate population dayroom activities,

phone calls, visiting and unescorted movement.  There will be no deviation of the PSR without

the approval of the Facility Captain."

Regarding the issue of whether Defendants had any knowledge that Plaintiff was in any

danger from attack by inmates Romero or Stark, the Court finds that Defendants have met their

burden on summary judgment.  Both Defendants declared that at no time before the incident did

Plaintiff tell either of them that he had concerns for his safety or that he feared programming

with White inmates.  Both Defendants declared that they had no knowledge that White inmates

intended to attack Black inmates, such as Brown, and they relied on the PSR dated November 17,

2008, which provided that Black and White inmates were allowed to have dayroom activities

together.   Further, in his deposition, Plaintiff concedes that he is not making any claims that

Defendants knew beforehand that Plaintiff was in any particular danger.  His only claim is that

Defendants failed to protect him once the fighting began.  Plaintiff concedes that he has no

evidence or knowledge that Defendants knew that inmates Romero or Stark were going to attack

Plaintiff. (Dep. 49:5-7.)

Plaintiff testified that he did not speak with with Lopez or Lantia regarding any concern he had

about being around White inmates.  (Id. 31:2.)

In his declaration filed in opposition to the motion, Plaintiff declares that "Defendants

Lantia and/or Lopez, Facility C8 control booth officers, deliberately and maliciously allowed two

White inmates out of their cell, which was adjacent to mine, and approximately 20 seconds later

opened my cell door allowing the inmates out of their cell, allowing the inmates to enter and stab

me a minimum of eight times." (Brown Decl. ¶ 2.)[3]   Plaintiff fails to offer any evidence that

would establish that this statement in his declaration is based on personal knowledge.  Federal

Rule of Civil Procedure 56(c)(4) requires that declarations and affidavits be based on personal

knowledge.  While Plaintiff sincerely believes that Defendants intentionally let Romero and

Stark out of their cell with the intention that they harm Plaintiff, he offers no evidence on which

to base this belief.

Plaintiff also argues (in his declaration) that "there is nothing in C/O Arnold's

crime/incident report (Log No. SATF-0003-08-11-0458) that remotely suggest that there were

any other inmates in Facility-C8 dayroom other than Romero, Stark, and myself, nor is there any

evidence that suggest there were additional cell-doors opened other than cell 123 (Romero and

Stark's cell) and cell 124 (my cell)."  Plaintiff refers to his Exhibit D.  Plaintiff's Exhibit D is a

copy of the report referred to above, and includes several photographs of the crime scene.

Plaintiff appears to argue that this report establishes that Defendants intentionally let Romero

and Stark out in order to attack Plaintiff.  Although Plaintiff believes this to be so, Exhibit D

does not establish any evidence from which an inference could be drawn that Defendants knew

that Romero and Stark were going to attack Plaintiff.

Further, Defendants' page 2 of Exhibit C to the declaration of Diana Esquivel is a copy of

the supplement to the crime/incident report referred to above.  The narrative summary of the

incident indicates that "on Tuesday, November 18, 2008, at about 1231 hours, on Facility "C"

Building 8 as Officer C. Lantia, C8 Dining/Control Yard was conducting dayroom release he

opened cells 121, 122, 123 and then started to open cells 124, 125, and 126 at which time he

heard a scuffle."  Exhibit C establishes that the cell doors were opened in groups of three.  As

---

[3] The complaint is signed under penalty of perjury.  A verified complaint in a pro se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the complaint is based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief.  McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987)(per curiam); Lew v. Kona Hospital, 754 F.2d 1420, 1423 (9th Cir. 1985); Fed. R. Civ. P. 56(c)(4).

noted above, the declarations of both Defendants establish that the inmates were released to dayroom in accordance with procedure.

Plaintiff also argues that because there was a lockdown imposed because of a racially motivated disturbance in July of 2008, the attack on him was racially motivated. Defendants were aware of the earlier incident, and, therefore, are liable because they deliberately let two White inmates out of the adjacent cell at the same time Plaintiff's cell was opened. Plaintiff offers no evidence to support this argument. The PSR clearly indicated that Defendants were directed to allow White and Black inmates dayroom activities and unescorted movement. Defendants have come forward with evidence that establishes that they had no authority to alter this directive. That Plaintiff's evidence may establish that the attack was racially motivated does not create a triable issue of fact. Liability in this case turns on whether Defendants knew of a particular harm to Plaintiff and acted with deliberate indifference to that harm. That there was an earlier racially motivated disturbance does not establish evidence that Defendants knew of a particular risk of harm to Plaintiff five months later. Defendants have come forward with evidence that they were acting pursuant to the PSR and in accordance with established procedures. Plaintiff has not come forward with any evidence to the contrary. Judgment should therefore be entered in favor of Defendants on the issue of whether they knew of any danger to Plaintiff prior to the attack.

Regarding the issue of whether Defendants, as Plaintiff alleges, failed to activate the alarm or respond to the attack on Plaintiff, the Court finds that Defendants have met their burden. Lopez's declaration establishes that by the time she was aware of what was happening, the incident was over, and she did not delay in responding to the alarm. Lantia's declaration establishes that he immediately activated his alarm and ordered the inmates in the dayroom to get down, that inmates Romero and Stark failed to comply with his order to get down, that he aimed his 40mm launcher at Romero and Stark, and that the inmates complied with the second order to get down. Lantia further declares that the entire incident lasted a matter of seconds.

In opposition, Plaintiff argues that "at no time, while Greg was conscious and under attack, did Lantia or Lopez take any actions or use any force to eliminate the substantial threat to Greg's life." (Opp'n 3:14-16.)  Regarding the assault, Plaintiff declares that:

> As the assault traveled outside of the cell, I notice two correctional staff figures standing in the control booth tower witnessing the assault.  While I was conscious, at no time did either figure take any actions to avert or cease the assault.  I cannot account for any actions in which the figures took while I was knocked unconscious. On information and belief, Defendants Lantia and Lopez were the only two correctional officers assigned to that post and they were present at the time I was being assaulted.
>
> The entire assault lasted approximately one and a half minutes, with a 5-8 seconds pause therein.

(Brown Decl. ¶¶ 3-4.)   Plaintiff refers the Court to his Exhibit C, Defendants' First Supplemental Response to Plaintiff's Request for Production of Documents, Set One, Request No. 21 and its Attachment L.  Attachment L is a copy, in redacted form, of the relevant pages to the C-8 control booth log for November 18, 2008.  Nothing in Exhibit L establishes evidence that Defendants failed to respond to the attack on Plaintiff on November 18, 2008, or were in any way deliberately indifferent to a serious risk Plaintiff's safety.

Plaintiff also argues that Defendants violated CDCR policy.  Specifically, Plaintiff argues that 12:30 was the time for count, and CDCR policy prohibits any inmate activity at a time which would disrupt a facility count.  As noted, liability turns on whether Defendants failed to timely respond to the attack on Plaintiff such that they were deliberately indifferent to a serious risk to Plaintiff's safety.  Whether Defendants released inmates to dayroom activities during the time period for count is irrelevant to their response to the attack.

In his deposition, Plaintiff testifies that although "there was never an alarm," and that he did not hear an order to get down, he was not in a position to observe all of Defendants' activities. Plaintiff testified that although he could see Defendants, he could not see their hands, see

11

whether they were pushing any buttons, or whether they were talking or saying something.  (Dep.

50:5-11.)  Plaintiff also testified that at some point he lost consciousness.   When asked to

respond to reports indicating that an alarm was sounded and officers responded, Plaintiff testified

as follows:

> Q.      At any time after your attack, did you ever talk to either
> Lantia or Lopez about what happened on November 18?
>
> A.      Not that I can recall.
>
> Q.      Again, like I said, you received - - we produced to you a
> copy of the 837 Report about what transpired on November
> 18.
>
> A.      Okay.  That's on the - -
>
> Q.      The Incident Report.
>
> A.      Okay.  Yes.
>
> Q.      Okay.  Did you have an opportunity to read Officer
> Lantia's report?
>
> A.      Yes.  Yes I did.
>
> Q.      Okay.  And in his report, he asserted that he sounded his
> alarm and then ordered - -gave two orders for - - he referred
> to the inmates - - to get down.  Do you recall reading that?
>
> A.      Yes, I do.
>
> Q.      Do you have any evidence to dispute that he did not sound
> the alarm?
>
> A.      Yes.  My testimony is evidence enough that he did not,
> because I did not hear any sound of any alarm.  I did not
> hear anybody say, "Get down."  None of that took place.
> His whole report appears to be fabricated.
>
> Q.      Are you claiming he fabricated his report, or you just think
> he fabricated his report?
>
> A.      There was no announcement of an alarm.  There was no
> statement of "Get down."  Of course he had to fabricate
> that part of his report, and maybe other parts of his report,
> because that did not occur.
>
> Q.      In addition to Lantia's report, there were reports of several
> other officers of that incident that we sent in that package
> we sent to you.

A.      Yes.

Q.      Did you read those?

A.      I can't recall what they actually said, the contents of them, but I'm pretty sure I reviewed them.

Q.      In those reports that officers responded to C Section of Building 8 in response to an alarm, are you claiming that that's also a false statement?

A.      No.  What I was claiming, as I was conscious when the fight was taking place, there was no alarm.  What occurred when I was unconscious, it is what it is.  But as I was conscious, that did not occur.

Q.      And as you sit here today, you don't know how long you were unconscious, right?

A.      Correct.

Q.      It could have been five minutes, or it could have been five seconds?

A.      I don't think it was five minutes.  I'm not exactly sure how long, though.

(Id. 50:13 -52:14.  Plaintiff concedes that during the fight, he was not able to pay attention to what Defendants were doing.  (Id. 46:14.)   In his declaration, Plaintiff states that "While I was conscious, at no time did either figure take any actions to avert or cease the assault.  I cannot account for any actions in which the figures took while I was knocked unconscious."  (Brown Decl. ¶ 3.)

Plaintiff's evidence consists of his subjective impressions  - Plaintiff did not hear the alarm and did not see Defendants immediately respond.  Therefore, Plaintiff argues that "on information and belief" that there was no alarm and no response.  However, such statements alone are not sufficient to establish personal knowledge and competency.  That must be shown by the facts stated – they must be matters known to Plaintiff personally, as distinguished from opinion.  Bank Melli Iran v. Pahlavi, 58 F.3d 1046, 1412 (9th Cir. 1995).  This action is not proceeding on any claims that Defendants made false statements in their report, and Plaintiff

concedes in his deposition that he is not claiming the reports that officers responded to an alarm were false.

**V.       Conclusion**

Defendants have come forward with evidence that they responded to the attack on Plaintiff.  Defendants' evidence establishes that once they became aware that Plaintiff was being attacked, an alarm was sounded, the inmates were ordered down, and a 40 mm launcher was readied.  Defendants' evidence establishes that the launcher was not deployed due to the risk of injury to other inmates.  Defendants correctly argue that C/O Lantia is entitled to deference for his decision to use verbal commands before using physical force.  See  Whitley v. Albers, 475 U.S. 312, 322-23 (1986)(citing Bell v. Wolfish, 441 U.S. 520, 547 (1979).  Plaintiff has failed to come forward with evidence that Defendants were deliberately indifferent.  The evidence establishes that Plaintiff was focused on defending himself from attack, and could not observe or hear Defendants.  Plaintiff concedes that he was unconscious for a period of time.  As noted, Plaintiff concedes that he is not claiming the reports indicating that the officers responded to the alarm were false.

Accordingly, IT IS HEREBY ORDERED that Defendants' motion for summary granted. Judgment to entered in favor of Defendants and against Plaintiff.  The Clerk is directed to close this case.

IT IS SO ORDERED.

Dated:   **December 11, 2013**

**/s/ Gary S. Austin**

UNITED STATES MAGISTRATE JUDGE